# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00435-CV

---

**J. M., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 321,340-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

J.M. (Father) appeals from a judgment terminating his parental rights to his son (Child) aged two years at the time of trial.[1]  Father argues that the district court never acquired personal jurisdiction over him and, in the alternative, challenges the legal and factual sufficiency of the evidence supporting the four statutory predicates and the finding that termination is in Child's best interest.  We affirm.

## BACKGROUND

Child was born in January of 2020.  Father and Mother were sixteen years old at the time and living with their respective mothers.  Father later testified that he had little involvement in Child's life at this point because Mother's family did not want him around.

---

[1] We refer to Child's parents and his other relatives by their relationship to him and an alias.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

Mother would sometimes "sneak" Father into the house so that he could watch Child while Mother slept.

Child lived with Mother at Maternal Grandmother's house until August of 2020, when the Department of Family and Protective Services removed Mother and her siblings from that house because of allegations of physical abuse and neglect. According to the removal affidavit, Mother made an outcry that "[Maternal Grandmother] had physical altercations with her in the past," and her brother had been injured in a fight and left alone in the hospital because Maternal Grandmother arrived intoxicated. The Department placed Mother and Child together and Mother's siblings in a separate home. Child stayed with Mother because, according to the removal affidavit, "[T]here were no concerns for [Child's] safety at the time of the removal."

That changed in November of 2020 when the caregiver of Mother's brother reported that Mother came to the house "attempting to start a fight" and threatened to have her uncle "spray their house." Mother did not have Child with her at the time and refused to divulge his location. According to the Department's caseworker, Mother and Child were on "runaway" status for two weeks. For part of that time, Mother and Child stayed with Father and later with Maternal Grandmother. After the Department found Mother and Child, they both tested positive for cocaine and marijuana. The Department removed Child from Mother. The Department considered placing Child with Father until he tested positive for marijuana and methamphetamines. Child was placed with a foster family, where he remained throughout the case.

On December 1, 2020, the Department filed its original petition seeking to terminate the rights of both parents. On the same day, citation was issued to Mother, Father, and their respective mothers. None of the first round of citation was served. The Department

2

eventually served Paternal Grandmother "as parent of minor child [Father]." Nothing in the record indicates that Father was ever personally served with citation. Father appeared in court with his appointed counsel the following week. Father subsequently filed a counterpetition seeking to vacate the acknowledgment of paternity that he signed at Child's birth. He attached to the counterpetition an affidavit from Paternal Grandmother verifying the truth of the allegations. However, neither Paternal Grandmother nor another guardian appeared on Father's behalf before he turned eighteen at the end of March 2021. *See* Tex. R. Civ. P. 44 (minors must appear in court through guardian or next friend). The district court granted the counterpetition, and genetic testing later established Father's paternity.

The parties tried the case to the bench on March 30 and April 27, 2022. The associate judge admitted exhibits offered by the Department, including the Department's final report to the court and the affidavit supporting removal of Child. The Department's caseworker, Father, and Father's Virginia caseworker Mary Chamblis testified. The Department's caseworker testified that the Department created a service plan for Father laying out the steps necessary to obtain custody of Child. The service plan required Father to regularly drug test, attend and complete counseling, take all prescribed medications, and undergo a psychological and a psychiatric evaluation. The caseworker testified that Father told her that he would not drug test or fulfill any other requirement of the plan until his paternity was established. Father also informed her that he had been diagnosed with bipolar disorder but did not want treatment.

Shortly after the start of the case, Father moved to Virginia to live with his grandmother (Great Grandmother). The Department informed him at that time that he was responsible for finding and paying for his services. The caseworker testified that Father never provided the Department with drug test results or proof that he was engaging in the services

3

required by his plan. Father testified that he was engaging in services but that he was "not comfortable" providing documentation to the caseworker or in signing a release. Father explained that he did not drug test until the day before the final hearing because he "wasn't ready yet." Father also testified that he started a job at a McDonalds three weeks beforehand and was working 50 hours a week. When the final hearing resumed on April 27, 2022, however, he was no longer employed. He did not specify whether he was fired or quit and expressed his plans to work at Walmart.

After Father moved to Virginia, the Department arranged for him to have virtual visits with Child. The caseworker testified that the visits initially went well until August of 2021, when Father stopped regularly attending. Father told the caseworker that the change occurred because he had moved from Great Grandmother's house to his father's house. Great Grandmother had requested custody of Child and the Department indicated that the request would be denied if he lived in the same house. Father told the caseworker that he could not do a virtual visit from his new residence and lacked reliable transportation to Great Grandmother's house. Father's virtual visits with Child were suspended in January of 2022 because he had not provided drug test results.

Great Grandmother died in January of 2022. After her death, the caseworker and Paternal Grandmother discussed a potential placement, but Paternal Grandmother decided against it. The caseworker explained that Paternal Grandmother wanted custody of Child but had limited mobility and "did not feel that she could keep up with an active 2-year-old."

The Department's caseworker testified that Father was arrested "around the beginning" of the case for unlawful carrying of a weapon. She was unaware of the status of the charge but reported that Father told her the week before "that he didn't have the time available to

4

work services because of pending criminal charges." In his initial testimony, Father acknowledged that he had pending criminal charges at the start of the case. After the first day of the final hearing, Father traveled to Texas and entered a plea agreement with the county attorney where he was placed on deferred-adjudication probation.

The court also heard testimony from Mary Chamblis, who described herself as a "case manager" at the "Life Management Program at Western Tidewater Community Services Board" in Virginia. Father had enrolled in the program, which provides "wraparound therapeutic services." According to Chamblis, at the time of trial, Father was meeting with a psychiatrist, attending weekly therapy sessions, and receiving outpatient drug treatment.

The caseworker testified that the foster parents can meet all of Child's needs and intend to adopt him if Father's rights are terminated. Child's guardian ad litem testified that Child's foster parents are meeting his needs. She recommended that the court terminate the rights of both parents so that the foster parents could adopt Child.

Following the hearing, the associate judge rendered judgment terminating the rights of both parents. With respect to Father, the judge found that the Department had proven four predicate grounds for termination and that termination is in Child's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O), (b)(2). Father requested a de novo hearing before the district court. The district court heard testimony from the caseworker and one of Child's foster parents and admitted evidence from the hearing before the associate judge. The district court subsequently rendered judgment terminating Father's rights on the same grounds as the associate judge. Father timely appealed.

5

**PERSONAL JURISDICTION**

Father argues in his first issue that the district court never acquired personal jurisdiction over him because he was a minor when the case began. Whether personal jurisdiction exists is a question of law that we review de novo. *Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018).

To render a valid judgment, "a court must have both subject-matter jurisdiction over a case and personal jurisdiction over the party it purports to bind." *In re Guardianship of Fairley*, 650 S.W.3d 372, 379 (Tex. 2022). Establishing personal jurisdiction over a party requires "citation issued and served in a manner provided for by law." *Id.* at 380 (citing *In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012)). In a suit seeking termination of parental rights, citation "shall be issued and served as in other civil cases." Tex. Fam. Code § 102.009(c). "If service is invalid, it is 'of no effect' and cannot establish the trial court's jurisdiction over a party." *E.R.*, 385 S.W.3d at 563 (quoting *Uvalde Country Club v. Martin Linen Supply Co.*, 690 S.W.2d 884, 885 (Tex. 1985) (per curiam)). A "complete failure of service deprives a litigant of due process and a trial court of personal jurisdiction; the resulting judgment is void and may be challenged at any time." *Id.* at 566.

Generally, a party waives complaints about service of process by making a general appearance. *See* Tex. R. Civ. P. 120 (stating that general appearance has "the same force and effect as if the citation had been duly issued and served as provided by law"); *Baker v. Monsanto Co.*, 111 S.W.3d 158, 161 (Tex. 2003) (stating that "general appearance in action waives any defect in the manner of service"). "[A] party enters a general appearance when it invokes the judgment of the court on any question other than the court's jurisdiction, recognizes by its acts that an action is properly pending, or seeks affirmative action from the court." *J.O.*

6

*v. Texas Dep't of Fam. & Protective Servs.*, 604 S.W.3d 182, 189 (Tex. App.—Austin 2020, no pet.) (citing *Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004) (per curiam)).

Father, however, was a minor at the time the Department filed its original petition. Minors are considered to be under a legal disability and are therefore "unable to sue or be sued in their individual capacities; they are required to appear in court through a legal guardian, a 'next friend,' or a guardian ad litem." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005). "Consequently, a minor cannot waive service or consent to the jurisdiction of the court." *N.J. v. Texas Dep't of Fam. & Protective Servs.*, 613 S.W.3d 317, 321 (Tex. App.—Austin 2020), *vacated as moot*, 644 S.W.3d 189 (Tex. 2022) (citing *In re W.L.C.*, 562 S.W.2d 454, 455 (Tex. 1978) (per curiam)); *see Wheeler v. Ahrenbeak*, 54 Tex. 535, 539 (Tex. 1881) (explaining that waiver of service is "the voluntary act of the party himself" and "that to be binding it must have been done by one legally capable of performing it"). Generally, when a minor is named party to a suit, the minor must be personally served. *See N.J.*, 613 S.W.3d at 321; *In re Estate of Bean*, 120 S.W.3d 914, 920 (Tex. App.—Texarkana 2003, pet. denied). Under certain circumstances, minors may be properly joined through their legal guardian or next friend. *See American Gen. Fire & Cas. Co. v. Vandewater*, 907 S.W.2d 491, 492 (Tex. 1995); *N.J.*, 613 S.W.3d at 321. When that occurs, whether the court acquired personal jurisdiction depends on "whether the minor's interests have been properly protected and whether a deficiency in notice or due process has been shown." *Vandewater*, 907 S.W.2d at 492.

Father presumes that this rule governs because he was a minor at the time the Department served him through Paternal Grandmother. Father relies entirely on cases where the

minor party had not become an adult when the trial court rendered judgment.² *Cf., e.g., N.J.*, 613 S.W.3d at 321 ("Because the record establishes that N.J. was a minor during the proceedings below, including when the trial court signed the judgment terminating her parental rights, we disagree with the Department's assertion that N.J.'s appearance in the suit relieved it of its duty to ensure that she was properly served with citation."); *Estate of Bean*, 120 S.W.3d at 920–21. Father cites only one authority holding that a person who becomes an adult before the trial court renders judgment cannot waive defects in service by entering an appearance. *See In re M.M.S.*, No. 14-16-00349-CV, 2016 WL 6134456 (Tex. App.—Houston [14th Dist.] Oct. 20, 2016, pet. denied) (mem. op.). We do not find that case persuasive.

In *M.M.S.*, the Department served the minor parent three weeks before she turned eighteen. *Id.* at *3. The minor was not served with citation after becoming an adult. *Id.* After becoming an adult, the parent signed a mediated settlement agreement. *Id.* She later participated in an adversarial hearing where she sought to set aside the agreement. *Id.* On appeal, she argued that the court never obtained personal jurisdiction over her because she was not represented by a parent, guardian, or next friend when she was served. *Id.* The Department responded that she had waived service by participating in the adversary hearing. *Id.* Our sister court rejected the Department's argument, reasoning that she was a minor when she was served and her "later appearance after turning eighteen does not cure her lack of capacity at the time she was served." *Id.* at *4. The court cited the supreme court's decision in *E.R.*, which states the general proposition that "[i]f service is invalid, it is 'of no effect' and cannot establish the trial court's jurisdiction over a party." 385 S.W.3d at 563. But the court did not explain why the parent

---

² We observe that Father turned eighteen over a year before the final judgment in this case.

could not enter a general appearance after becoming an adult, and it relied entirely on authorities concerning persons who were minors at the time the lower court rendered judgment. *See M.M.S.*, 2016 WL 6134456, at *3. Father has cited no other authorities holding that an adult person cannot enter a general appearance prior to the judgment because the person was a minor when the action began, and we are aware of none. Absent further guidance from the supreme court, we will apply the general rule that an adult may waive any complaints about service by entering a general appearance. *See* Tex. R. Civ. P. 120; *Baker*, 111 S.W.3d at 161 (stating that "general appearance in action waives any defect in the manner of service").

We now determine whether Father entered a general appearance. Texas courts "routinely hold that a court-appointed attorney who files an answer or seeks affirmative action from the court invokes the court's jurisdiction and thus enters a general appearance on behalf of the client." *Fairley*, 650 S.W.3d at 386. In the context of termination of parental rights, courts have held that when an attorney ad litem attends a hearing and announces "not ready" but participates in the hearing by objecting to the admissibility of evidence, or by questioning witnesses about information relevant to the termination of the parent's parental rights, "the attorney's actions constitute a general appearance and establish the court's personal jurisdiction over the parent." *In re M.D.M.*, 579 S.W.3d 744, 759 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (citing *In re P.Y.M.*, No. 04-13-00024-CV, 2013 WL 4009748, at *2 (Tex. App.—San Antonio Aug. 7, 2013, pet. denied) (mem. op.)). Here, at the final hearing held after Father became an adult, Father's counsel announced ready, questioned each of the Departments' witnesses about information relevant to Father's fitness as a parent and his relative responsibility for Child's removal. At the end of the hearing, counsel asked the district court to find the Department had not met its burden and to return Child to Father. Further, Father testified that he

9

was asking the court to return Child to his custody. We conclude that Father waived any defects in service by appearing and seeking the court's judgment on the merits of the Department's petition to terminate his parental rights. *See M.D.M.*, 579 S.W.3d at 759; *In re D.M.B.*, 467 S.W.3d 100, 103–04 (Tex. App.—San Antonio 2015, pet. denied) (holding parent entered general appearance through court-appointed counsel, who participated at hearing and opposed Department's requests). We overrule Father's first issue.

## SUFFICIENCY CHALLENGES

Having rejected Father's jurisdictional challenge, we turn to his challenges to the sufficiency of the evidence.

A court may render judgment terminating the parent-child relationship if it finds by clear and convincing evidence that the parent's acts or omissions satisfy at least one statutory ground for termination and that termination is in the best interest of the child. Tex. Fam. Code § 161.001(b)(1), (2). "Clear and convincing evidence" is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

The heightened burden of proof in parental termination cases requires "a concomitantly heightened standard of appellate review." *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020) (per curiam). In reviewing for legal sufficiency, a court should look at "all the evidence in the light most favorable to the finding." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under the clear-and-convincing standard, the reviewing court "cannot ignore undisputed evidence

contrary to the finding" but "must otherwise assume the factfinder resolved disputed facts in favor of the finding." *A.C.*, 560 S.W.3d at 630–31. Evidence is legally insufficient if, after conducting this review, the reviewing court concludes that "no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true." *Z.N.*, 602 S.W.3d at 545 (citing *J.F.C.*, 96 S.W.3d at 266).

Factual-sufficiency review, in contrast, "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. Under either standard, the trier of fact remains "the sole judge of the witnesses' credibility and the weight to be given to their testimony." *A.A. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00307-CV, 2021 WL 5893695, at *4 (Tex. App.—Austin Dec. 14, 2021, no pet.) (mem. op.).

***Predicate Findings***

The district court found that the Department had proven four predicate grounds for termination. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O). We begin with the Subsection (D) and (E) findings because the supreme court has held that allowing Subsection "(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam).

Termination of the parent-child relationship may be ordered under Subsection (D) if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D), and under Subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id*. § 161.001(b)(1)(E). These grounds are intertwined; Subsection (D) focuses on the child's environment—which includes the child's living conditions and the environment produced by the conduct of the parents or others in the home—and whether the environment itself endangered the child, while Subsection (E) focuses on the parent's conduct and whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *S.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00085-CV, 2021 WL 3437890 at *11 (Tex. App.—Austin Aug. 6, 2021, no pet.) (mem. op.); *see also In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied). Both subsections require proof of endangerment, which means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 698–99 (Tex. App.—Austin 2019, pet. denied). A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699.

Father argues that there is insufficient evidence to support the Subsection (D) finding because he was unaware that Child was in a dangerous environment. *See In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[S]ubsection D is not a basis for termination of parental rights if the parent was unaware of the endangering environment."). He relies on his uncontradicted testimony that he was unaware of Mother's drug use or the conditions in Grandmother Melissa's home that led to the removal of Mother and her siblings, did not hide her from the Department during the two weeks that she was on runaway status, and did not supply her with drugs. The caseworker also acknowledged that while Father was aware of Mother's whereabouts, "I don't believe that he knew the circumstances of her CPS case. So he may not have known that there was an issue." But the factfinder is the ultimate arbiter of the credibility of the witnesses and the weight to be given to their testimony. *A.A.*, 2021 WL 5893695, at *4. The district court also heard testimony that Father was present in the home with Child while Mother was sleeping, suggesting that he had first-hand knowledge of the conditions of the home. Moreover, Father conceded that Mother told him "what was going on" and that he did not alert the Department to her location. Under the circumstances, the district court could have reasonably concluded that Father's testimony that he was unaware of Mother's drug use or the conditions in Maternal Grandmother's home was not credible. Taken together, the evidence supports the finding that Father knowingly allowed Child to remain in a dangerous environment. *See F.H. v. Texas Dep't of Fam & Protective Servs.*, No. 03-22-00231-CV, 2022 WL 4540839, at *4–5 (Tex. App.—Austin Sept. 29, 2022, pet. denied) (mem. op.) (holding testimony that father was present in mother's home during her pregnancy supported finding that he was aware of her drug use).

13

The record also supports the finding that Father engaged in a course of endangering conduct required for termination under Subsection (E). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009). Endangering conduct "may include the parent's actions before the child's birth." *Id.* at 345. Evidence of a parent's criminal history and convictions may establish an endangering course of conduct. *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.). "Routinely subjecting a child to the probability that she will be left alone because her parent is in jail, endangers the child's physical and emotional well-being." *Id.* at 525–26 (citing *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.)). Father was arrested for unlawfully carrying a weapon less than three months after the Department petitioned to terminate his parental rights. He left the state with that charge still pending and did not resolve it until after the final hearing began even though he told the Department that he takes regular trips to Texas. Further, Father was charged with possession of marijuana in 2017 and arrested and adjudicated delinquent for burglary of a habitation in 2018. The court reasonably could have considered these offenses "'as part of a voluntary, deliberate, and conscious course of conduct' that has the effect of endangering [Child]." *See J.S.*, 584 S.W.3d at 636 (quoting *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.)).

Father's drug use is also evidence of endangerment. *See J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct"). His initial positive test for methamphetamines precluded the Department from placing Child with him. When asked why he did not take drug tests after his paternity was confirmed, Father replied: "I wasn't ready yet" and "I had to keep my mind

14

stable." Father stated that he took a drug test the day before the final hearing but did not have the results. The court reasonably could have inferred that Father was refusing to drug test because he was using drugs. *See F.H.*, 2022 WL 4540839, at *5 ("A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs." (citing *J.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00814-CV, 2019 WL 1646268, at *2 (Tex. App.—Austin Apr. 17, 2019, pet. denied))). Evidence that a "parent continued to use illegal drugs when he knew his parental rights were in jeopardy 'is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being.'" *See id.* (quoting *J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 WL 5456653, at *6 (Tex. App.—Austin Nov. 17, 2021, pet. denied) (mem. op.)).

Considering the entire record, we conclude that a reasonable factfinder could form a firm belief or conviction that Father knowingly allowed Child to remain in dangerous conditions and knowingly engaged in a course of endangering conduct himself. *See* Tex. Fam. Code. § 161.001(b)(1)(D), (E). The evidence is therefore factually sufficient to support those findings. Because the evidence is factually sufficient, it is necessarily legally sufficient. *See A.F. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00670-CV, 2022 WL 2068818, at *7 (Tex. App.—Austin June 9, 2022, pet. denied) (mem. op.) ("Evidence that is factually sufficient to support a trial court's finding necessarily satisfies the legal-sufficiency standard."). We overrule Father's fourth and fifth issues. We do not address his second and third issues, which challenge the other predicate findings. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (noting that Section 161.001 requires proof of only one statutory predicate to support termination).

15

*Best Interest*

Father argues in his final issue that the record contains legally and factually insufficient evidence that termination is in Child's best interest. The best-interest analysis "is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). To determine whether termination is in a child's best interest, we consider the non-exclusive *Holley* factors:

- the child's wishes;

- the child's present and future emotional and physical needs;

- any emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist the individuals seeking custody;

- the plans for the child by the individuals or agency seeking custody;

- the stability of the proposed placement;

- parental acts or omissions which may indicate that the existing parent-child relationship is improper; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). A best-interest finding does not require proof of a specific factor or set of factors. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

We begin with Child's wishes. Child—twenty-six months at the start of the final hearing and twenty-eight months at the de novo hearing—was too young to express his desires.

16

"When a child is too young to express [his] desires, the factfinder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent." *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). The caseworker testified that Child is "well bonded" with the foster family and has spent most of his life with them. In contrast, Father has spent minimal time with Child since his birth and stopped regularly attending visitations in August of 2021.

Turning to Child's present and future physical and emotional needs, "it is well settled that stability and permanence are paramount considerations in evaluating the needs of a child." *N.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00028-CV, 2022 WL 2673236, at *8 (Tex. App.—Austin July 12, 2022, no pet.) (mem. op.). "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.) (citing *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.)). Father testified that he was employed for three weeks during the case but did not explain why his employment ended. He was not employed by the end of the final hearing but testified to having an upcoming interview at Walmart. But self-serving testimony of such a "speculative" and "hypothetical" nature does not constitute evidence of a concrete plan for a child. *See, e.g.*, *In re A.P.S.*, No. 07-11-00476-CV, 2012 WL 1835688, at *7 (Tex. App.—Amarillo May 21, 2012, no pet.) (mem. op.); *Gonzalez v. Texas Dep't of Fam. & Protective Servs.*, No. 03-06-00004-CV, 2008 WL 2309208, at *6, *9 (Tex. App.—Austin June 5, 2008, no pet.) (mem. op.). Moreover, the caseworker testified that Father never provided her with pay stubs or any other proof of income.

17

With respect to the present and future danger to Child, Father argues that there is "no direct evidence of emotional or physical danger" to [Child]. He asserts that the caseworker conceded as much when she agreed with his counsel that there is "no reason [Father] can't have contact in the future as far as the Department's concerned." The caseworker testified that while she saw no reason they could not have virtual contact, Father should provide proof that he is not using illegal drugs before meeting in person. Regarding Father's larger point that there is no evidence he posed a direct danger to Child, endangering conduct need not be directed at the child or result in an actual injury. *See E.N.C.*, 384 S.W.3d at 803; *A.C.*, 577 S.W.3d at 699. Father engaged in a pattern of criminal conduct that could have resulted in his incarceration and inability to care for Child. *See E.N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *7 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) ("Routinely subjecting a child to the probability that she will be left alone because her parent is in jail, endangers the child's physical and emotional well-being." (citing *J.S.*, 584 S.W.3d at 635)).

With respect to the parenting abilities of the persons seeking access to Child, Father's history of arrests reflects negatively on his parenting abilities. *See F.H.*, 2022 WL 4540839, at *7 (parent's repeated arrests "suggest that his parenting skills are seriously suspect" (citing *In re A.M.*, No. 02-16-00208-CV, 2016 WL 7046858, at *4 (Tex. App.—Fort Worth Dec. 2, 2016, no pet.) (mem. op.))). Also relevant is Father's lack of a steady income, long-term residence, and instability. *See J.D.*, 436 S.W.3d at 119 ("A parent's . . . unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest."). For unexplained reasons, Father was unable to keep a job for more than three weeks during the case and was unemployed when the

final hearing ended. Moreover, Father never provided the Department with drug test results even though he knew testing was a condition on his visits with Child.

Father points out that the caseworker testified that "while [Father's] parenting abilities may be limited, he could work with [Paternal Grandmother] to provide adequate care for [Child]." But the quotation is taken out of context. The caseworker in fact said that she had concerns regarding both Paternal Grandmother and Father. The caseworker is not concerned by Paternal Grandmother's parenting skills but with her mobility; she is concerned by Father's lack of parenting skills, history of drug use, lack of income, and likely inability to provide a stable home. She never testified that Paternal Grandmother's involvement would ameliorate her concerns regarding Father.

Regarding plans for Child, Father testified that he intends to "be there by his side each and every step." He gave no specifics beyond that his extended family will help him care for Child. *See A.P.S.*, 2012 WL 1835688, at *7 (self-serving "hypothetical" does not constitute evidence of concrete plans). The caseworker testified that the Department intends to leave Child in his current placement while the foster family applies for adoption. Foster Mother testified that her family plans to adopt Child if both parents' rights are terminated. Foster Mother added that she has not received any support from Father and that he has not sent any gifts, cards, or pictures.

Finally, we consider any evidence that the parent-child relationship is improper and any excuses for the parent's conduct. Father's arrests and conviction are indicators of an improper relationship, *see N.K.*, 2022 WL 2673236, at *9, as are his failure to provide drug test results and proof that he completed other parts of his service plan, *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (holding that evidence parent failed to complete court-ordered service plan can support best-interest finding); *In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st

19

Dist.] 2017, pet. denied) ("A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that he does not have the ability to motivate himself to seek out available resources needed now or in the future."). It is especially relevant that Father failed to provide evidence that he tested negative for drugs when doing so resulted in the abatement of his virtual visits with child. *See, e.g.*, *J.M.T.*, 519 S.W.3d at 270 ("[D]espite being offered substance-abuse counseling and individual therapy, Father did not refrain from illegal drug use and did not complete either program.").

Father attributes any shortcomings to his relative youth, citing the caseworker's testimony that there is no reason why Father could not learn parenting skills. He argues that presumption in favor of preserving the parent-child bond precludes termination in this instance. Although courts presume that preserving the parent-child relationship is in the best interest of the child, it is the "child's need for permanence through the establishment of a stable, permanent home" that is "the paramount consideration in a best-interest determination." *E.N.*, 2021 WL 2460625, at *8 (citing *L.G.R.*, 498 S.W.3d at 205). Taken together, the record before us would enable a reasonable factfinder to conclude that Father would be unable to provide that stability in the future. *See J.G.*, 592 S.W.3d at 525 ("A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." (citing *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.))).

Considering the entire record, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination is in Child's best interest. Thus, the evidence is factually sufficient to support that finding. Because the evidence is factually sufficient, it is

necessarily legally sufficient.  *See A.F.*, 2022 WL 2068818, at *7.  We overrule Father's sixth issue.

## CONCLUSION

We affirm the district court's judgment.

_____
Edward Smith, Justice

Before Chief Justice Byrne, Justices Triana and Smith
  Concurring Opinion by Justice Triana

Affirmed

Filed:  January 17, 2023